# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DENISE M. CLARK,**

**Plaintiff,**

**v.**

**FEDER, SEMO & BARD, P.C., et al.,**

**Defendants.**

Civil Action No.  07-0470 (JDB)

## MEMORANDUM OPINION

Denise Clark brings this action pursuant to the Employee Retirement Income Security Act

of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against the law firm Feder, Semo & Bard ("Feder

Semo"), the Feder Semo Retirement Plan and Trust ("Retirement Plan" or "Plan"), and two

former trustees of the Retirement Plan, Joseph Semo and Howard Bard.  Contending that

defendants improperly denied her the full value of her retirement benefits, Clark asserts a claim

for individual benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and a derivative claim for breach

of fiduciary duty pursuant to 29 U.S.C. § 1132(a)(2).  Before the Court is defendants' motion for

summary judgment, on which the Court heard oral argument on February 22, 2010.  Upon careful

consideration of the parties' memoranda, the applicable law, and the entire record herein, and for

the reasons set forth below, the Court will grant in part and deny in part defendants' motion.

## BACKGROUND

### I.    Factual Background

Clark worked as an attorney at Feder Semo for almost ten years, beginning in 1993.

Second Am. Compl. ¶ 3.  She became a "Class A" shareholder of the firm in March 2000, and in

October 2000, she became the firm's managing partner.  Second Am. Compl. ¶ 3.  She held this

position until she left the firm in July 2002.  Second Am. Compl. ¶ 3.

While at Feder Semo, Clark was a "participant" in the firm's Retirement Plan.  Second

Am. Compl. ¶ 3; <u>see also</u> 29 U.S.C. § 1002(7) (defining "participant").  Feder Semo was both the

"plan sponsor" and "plan administrator" of the Retirement Plan.  Second Am. Compl. ¶¶ 4-5; <u>see</u>

<u>also</u> 29 U.S.C. § 1002(16)(A) (defining "plan administrator"); <u>id.</u> at § 1002(16)(B) (defining

"plan sponsor").  The Plan was a type of "defined benefit plan" termed a "cash balance plan."

<u>See</u> Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") [Docket Entry 41], Defs.'

Statement of Undisputed Material Facts ("Defs.' SOF"), Exhibit 6 (Feder, Semo & Bard

Retirement Plan and Trust Summary Plan Description ("Summary Plan Description")), P0226.

This type of plan "defines benefits for each Participant by reference to the Participant's

hypothetical account."  <u>Id.</u>[1]  Based on the value of this account, Feder Semo would calculate an

individual's retirement benefits.

Under the terms of the Retirement Plan, retirement benefits were distributed primarily as

a "straight life annuity," for which regular monthly payments would be made to the participant

after the participant reached retirement age.  <u>See</u> <u>id.</u> at P0229.  Nevertheless, the Plan permitted

participants to waive the straight life annuity, and instead receive retirement benefits as "a lump

---

[1] Feder Semo maintained a hypothetical account for each participant that showed the
value of a participant's retirement plan.  Each hypothetical account was determined by reference
to "hypothetical allocations and interest adjustments that are analogous to actual contributions
and earnings to an account balance plan."  <u>Id.</u>; <u>see also</u> Defs.' SOF, Exhibit 1 (Terms of the
Feder, Semo & Bard Retirement Plan and Trust ("Feder Semo Retirement Plan Terms")), Sec.
2.3(b)(2) (delineating what percentage of an employee's yearly compensation would be credited
to his hypothetical account); <u>id.</u> at Sec. 5.1(d).  The account equaled the sum of the money Feder
Semo deposited into the account, and any interest that accrued on those funds.

sum payment or . . . installments over a designated period of time." Id. Participants who waived the annuity would obtain benefits equal to the actuarial equivalent of their straight life annuity. Id.

As plan administrator, Feder Semo retained the authority to "determine all questions relating to the eligibility of an Employee to participate in the Plan," to "compute . . . the amount and kind of benefits to which any Participant shall be entitled," to "carry[] out the funding policy and the method of funding," and to interpret provisions of the Retirement Plan. Feder Semo Retirement Plan Terms at Sec. 12.2. The firm also had the power to amend the Retirement Plan, see id. at Sec. 14.1, and to terminate the Retirement Plan at any time, see id. at Sec. 14.3. Moreover, pursuant to the Retirement Plan, Feder Semo was required to make the contributions necessary "to maintain the Plan on a sound actuarial basis and to meet minimum funding standards as prescribed by any applicable law." Id. at Sec. 4.1.

Exercising its authority under the Retirement Plan, Feder Semo amended or otherwise changed the Retirement Plan throughout its life. Several of those changes are relevant to the claims Clark asserts in this action. First, in October 1998 the firm changed the way it classified employees for purposes of crediting their accounts. See Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") [Docket Entry 58], Pl.'s Statement of Undisputed Material Facts ("Pl.'s SOF"), Exhibit 103 (Amendments to the Feder, Semo Retirement Plan), P0064-0066 (Third Amendment to the Feder Semo Retirement Plan). This amendment created four groups of employees, each of which received a different annual credit to their hypothetical account -- termed an account credit. The account credit was expressed as a percentage of an employee's yearly compensation:

Group A: All participants who were Class A shareholders of the firm and who

were born prior to January 1, 1950, received a credit of 45% of that individual's yearly salary.

Group B: All participants who were Class A shareholders of the firm and who were born after January 1, 1950, received a credit of 20% of that individual's yearly salary.

Group C: All participants who were either Class A or Class B shareholders of the firm and who were born after January 1, 1950, received a credit of 10% of that individual's yearly salary.

Group D: All participants who were not shareholders of the firm received a credit of 8% of that individual's yearly salary.

Id. at P0065-0066.  Thus, by its plain terms, the amendment indicated that Class A shareholders who were born after January 1, 1950, could be classified in either Group B or Group C.

Second, Feder Semo corrected this ambiguity in a 2003 restatement to the 1998 amendment.  See Pl.'s SOF, Exhibit 139 (Deposition of William Anspach ("Anspach Dep.")), 84:12-86:10.  After 2003, Group B comprised "all participants who are Class A shareholders . . . and who were born on or after January 1, 1950."  Feder Semo Retirement Plan Terms at Sec. 5.1(d).  Group C comprised "all participants who are shareholders . . . and are not covered by Groups A or B."  Id.  In other words, after the 2003 restatement, Class A shareholders born on or after January 1, 1950, could be classified only in Group B.

Third, in September 2003 Feder Semo amended the Retirement Plan to freeze the accrual of future retirement benefits.  Second Am. Compl. ¶ 11; see also Defs.' SOF, Exhibit 10 (Decl. of Mark C. Nielson ("Nielson Decl.")), ¶ 4 & Exhibit A (Sept. 5, 2003 amendment freezing Retirement Plan).

Fourth, in July 2005 the firm changed when an individual could obtain his or her retirement benefits.  See id. at ¶ 7.  Prior to July 2005, a former employee who had not yet

reached retirement age could obtain his benefits only on the five-year anniversary of his termination of employment. Second Am. Compl. ¶ 8. The July 2005 amendment, however, permitted employees who were shareholders of Feder Semo on or before December 31, 2004, to take their distributions immediately. See Nielson Decl. at ¶ 7. The firm adopted this amendment in part because the firm had lost its largest client in July 2005, "caus[ing] immediate concern with regard to the future viability of the Firm." Id. at ¶ 6.

Finally, in September 2005 Feder Semo terminated the Retirement Plan. See id. at ¶ 8. "Th[e] decision was made after it became clear . . . that the Firm would have to cease providing professional services to the public as of September 30, 2005." Id. Although the firm ceased the active practice of law, it apparently continues to exist as a corporation. Second Am. Compl. ¶ 4.

In early September 2005, Feder Semo notified Clark that it had suspended the Retirement Plan's distribution restrictions, and provided her with a distribution form and a summary of her benefits. See Defs.' SOF, Exhibit 9 (Record of Clark's Benefit Appeal), D0001-D0009 (Sept. 2, 2005 letter from Feder Semo to Denise Clark). The distribution form permitted Clark to elect several types of annuities or a lump sum payment. See id. at D0005.

Before Clark completed the benefits election form, Feder Semo notified her that it had terminated the Retirement Plan, and that "all benefits will be distributed." Id. at D0021 (Sept. 30, 2005 letter from Feder Semo to Denise Clark). As with its previous notification, Feder Semo's September 30, 2005 letter included a statement summarizing her benefits. See id. at D0024 (Statement of Benefits for Denise Clark). The statement indicated that Clark was entitled to a straight life annuity commencing at the normal retirement date of $4,860.55 a month, or a lump sum payment of $166,541.71. Although the lump sum actuarial equivalent of her straight life

annuity was $312,380.83, the notification informed her that all participants' benefits had been pro rata reduced to match the Retirement Plan's assets. See id. at D0022 ("[E]ach Participant's lump sum has been calculated . . . and then proportionately reduced so that the aggregate amount paid equals the trust assets."). Clark elected the lump sum payment of $166,541.71, see id. at D0061-0062 (Denise Clark election form), but, believing she was entitled to more, reserved the right to pursue any difference between the distribution and the full value of her accrued benefits, see id. at D0073-0074 (Appeal of Benefit Calculation and Plan Termination).

Clark appealed Feder Semo's calculation of her lump sum payment to the firm's Board of Directors -- composed of Joseph Semo, Howard Bard, and Mark Nielson -- seeking $145,839.12, the difference between $312,380.83 and $166,541.71. See id. at D0073-74. In her benefit appeal, Clark articulated several reasons for her position, and requested additional information explaining how the firm had calculated her lump sum payment. The Board considered the issues raised in Clark's appeal, consulting with the Retirement Plan's outside counsel and outside actuary, and denied her appeal. See Nielson Decl. at ¶¶ 10-11, 13; see also Record of Clark's Benefit Appeal at D0103-0109 (Dec. 14, 2005 Response to Denise Clark's Appeal of Benefit Calculation). The firm concluded that "[b]ased upon [its] review and the answers and information provided," as well as "Ms. Clark's refusal to provide any information that supports her claim of an incorrect benefit calculation," her "benefit under the Plan was calculated correctly." Record of Clark's Benefit Appeal at D0109. The firm also responded to two further inquiries from Clark regarding her benefit calculation. See id. at D0110-D0118 (Jan. 6, 2006 letter from Clark's counsel to William Anspach and Joseph Semo and response); id. at D0119-D0122 (June 13, 2006 letter from Clark's counsel to William Anspach and Joseph Semo and

response).  Unsatisfied with the responses she received, Clark brought this action.

## II.    The Claims in this Case

Clark asserts four theories of recovery in this case.  First, she contends that Feder Semo improperly grouped her for purposes of her account credit, thereby understating her retirement benefits by 41%.  See Pl.'s Opp'n at 1.  Second, she submits that Feder Semo violated ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), when it proportionately reduced the aggregate amount distributed to Plan participants to match the Plan's assets.  Second Am. Compl. ¶ 27.  Third, she argues that the Retirement Plan's fiduciaries failed to "use reasonable actuarial assumptions for interest and the expected retirement age in funding the plan."  Pl.'s Opp'n at 2.  And fourth, she opines that the Retirement Plan's fiduciaries failed "to comply with the termination restrictions in Treas. Reg. 1.401(a)(4)-5 which would have preserved over $700,000 for distribution to participants."  Id.

Clark asserts these theories either as components of her claim for individual benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) or as part of her derivative claim for breach of fiduciary duty pursuant to 29 U.S.C. § 1132(a)(2).  Because the parties dispute how her theories should be classified as claims, each theory's proper classification will be addressed where appropriate.

## ANALYSIS

## I.    Improper Grouping

Clark contends that Feder Semo improperly grouped her for purposes of determining what percentage of her yearly compensation would be credited to her retirement account.  According to Clark, because she became a Class A shareholder in March 2000, the 1998 amendment to the Retirement Plan required Feder Semo to classify her in Group B, and therefore

credit her account at 20% of her yearly compensation for the plan years ending in 2000, 2001, and 2002.  Id. at 14-15.  She argues, however, that Feder Semo improperly classified her in Group C during those plan years, and therefore she received an account credit of only 10% of her yearly compensation.  See id. at 15.  Even so, Clark observes that during her benefit appeal, the Retirement Plan's outside actuary, Dennis Reddington, recognized that Clark had been incorrectly classified.  See id.  According to her, "Reddington recommended that . . . Ms. Clark's . . . benefits be fully corrected from March 2000 forward to reflect the applicable pension classification."  Id.  Nevertheless, she asserts that Feder Semo did not correct her benefits even after recognizing its error.  Id.; see also Record of Clark's Benefit Appeal at D0106 (Dec. 14, 2005 Response to Denise Clark's Appeal of Benefit Calculation).

For its part, Feder Semo does not contest that Clark was classified in Group C even after she became a Class A shareholder.  Rather, the firm suggests that classifying Clark in Group C was a reasonable decision based on the language of the Plan's 1998 amendment.  See Defs.' Mem. at 22.  According to Feder Semo, the 1998 amendment ambiguously defined both Group B and Group C such that a Class A shareholder like Clark could fall within either group.  See Record of Clark's Benefit Appeal at PR074 (Nov. 4, 2005 email from William Anspach to Joseph Semo) ("The problem with the Third Amendment is that there appears to be a drafting error and the definitions of Class B and Class C are unclear.").  Feder Semo therefore posits that Clark could reasonably have been classified in either group.  See Defs.' Mem. at 22.  Feder Semo apparently also concluded that the 2003 restatement to the 1998 amendment correcting the ambiguity did not apply to Clark retroactively.  Record of Clark's Benefit Appeal at PR074 (Nov. 4, 2005 email from William Anspach to Joseph Semo) ("Since Denise was gone by [the time the

1998 amendment was corrected], the restatement does not affect her.").

A.    Standard of Review

Clark presents her improper grouping theory as part of her derivative breach of fiduciary duty claim pursuant to 29 U.S.C. § 1132(a)(2).  That is incorrect.  A claim brought under section 1132(a)(2) provides relief only for the plan itself and not for individual beneficiaries.  See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142 (1985).  Any recovery in such an action is restored to the retirement plan.  See Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc., 465 F.3d 1123, 1126 (9th Cir. 2006) ("ERISA gives plan beneficiaries nothing [when they sue on behalf of the plan]; any monetary recovery goes to the plan[] . . . ."); see also 29 U.S.C. § 1109.  Hence, a plaintiff "may bring a claim under [section 1132(a)(2)] in a 'representative capacity on behalf of the plan as a whole,' requesting, for example, that a breaching fiduciary return funds to the plan." Cook v. Campbell, 482 F. Supp. 2d 1341, 1357 (M.D. Ala. 2007) (quoting Russell, 473 U.S. at 142).  But a plaintiff may not seek to recover for herself under section 1132(a)(2).

Here, Clark's improper grouping theory does not allege an injury to the Retirement Plan as a whole -- it alleges only an injury to her.  Were she to prevail on her claim, any recovery would necessarily go to her, and to her alone.  Therefore, Clark's improper grouping theory cannot proceed pursuant to section 1132(a)(2).  See Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993) ("Russell therefore bars plaintiffs from suing under [section 1132(a)(2)] because plaintiffs are seeking damages on their own behalf, not on behalf of the Plan.").  It must proceed

as a claim for individual benefits under section 1132(a)(1)(B).[2]

Pursuant to the Supreme Court's decision in <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), a court reviews a section 1132(a)(1)(B) claim for individual benefits under a deferential standard of review when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone</u>, 489 U.S. at 115.[3]  The D.C. Circuit defines the <u>Firestone</u> standard as one of "reasonableness."  <u>Wagener v. SBC Pension Benefit Plan-Non Bargained Program</u>, 407 F.3d 395, 402 (D.C. Cir. 2005) (citing <u>Block v. Pitney Bowes, Inc.</u>, 952 F.2d 1450, 1452, 1454 (D.C. Cir. 1992)); <u>accord</u> <u>Moore v. CapitalCare, Inc.</u>, 461 F.3d 1, 11 (D.C. Cir. 2006).  This Court therefore reviews Feder Semo's classification of Clark in Group C for "reasonableness."

In order for the Court to determine if the firm's determination was reasonable, "'it is important for the plan to provide a final, fully considered, and reasoned explanation for the court to evaluate.'"  <u>Hall v. Nat'l R.R. Passenger Corp.</u>, 559 F. Supp. 2d 38, 48 (D.D.C. 2008) (quoting <u>Commc'ns Workers of Am. v. AT&T</u>, 40 F.3d 416, 433 (D.C. Cir. 1994)).  "A plan administrator's determination will be upheld 'so long as it is reasonably supported by the administrative record.'"  <u>Id.</u> (quoting <u>Mobley v. Cont'l Cas. Co.</u>, 405 F. Supp. 2d 42, 48 (D.D.C. 2005)).  And the Court must "review ERISA-plan benefit decisions on the evidence presented to

_____

[2] To be sure, at the motions hearing Clark suggested that her improper grouping theory could be characterized as a derivative claim because some other participants in the Retirement Plan may also have been improperly grouped.  But Clark did not assert any claims on behalf of these individuals in her complaint.  Even if she had, that a few specific individuals may have suffered a particular injury does not demonstrate that the Retirement Plan as a whole suffered an injury.

[3] It is undisputed that the plan administrator had such discretionary authority here.  <u>See</u> Feder Semo Retirement Plan Terms at Sec. 12.2.

the plan administrators, not on a record later made in another forum." Block, 952 F.2d at 1455. Accordingly, the Court can review Clark's improper grouping theory based only on the evidence Feder Semo's Board of Directors considered during Clark's benefit appeal.[4]

B.      Clark's Classification in Group C

Although Clark did not present her improper grouping theory to Feder Semo during her benefit appeal, the firm states that it "carefully considered and dealt with the issue with the advice of the Plan's counsel and the input of the Plan's actuary."  Defs.' Mem. at 22 (citing Record of Clark's Benefit Appeal at PR074-PR089, PR157).[5]  That is, Feder Semo submits that the administrative record of Clark's benefit appeal should contain their "fully considered and reasoned" explanation for the decision initially to classify Clark in Group C and to not correct that classification after the 2003 restatement.

On the basis of that administrative record, however, the Court cannot conclude that Feder Semo's position regarding Clark's grouping was "reasonable."  Feder Semo has not marshaled any evidence indicating why Clark was classified in Group C after she became a Class A

---

[4] Clark asserts this theory for the first time in her opposition to defendants' motion for summary judgment.  See Pl.'s Opp'n at 1.  Although defendants suggest in their opening brief that Clark's failure to present this theory during the administrative review process precludes her from asserting it in litigation, see Defs.' Mem. at 21, they seem to have abandoned this argument in both their reply brief and at the motions hearing.  And with good reason: section 1132(a) "does not require either issue or theory exhaustion; it requires only claim exhaustion."  Wolf v. Nat'l Shopmen Pension Fund, 728 F.3d 182, 186 (3d Cir. 1984); accord Vaught v. Scottsdale Healthcare Corp. Health Plan, 546 F.3d 620, 631 (9th Cir. 2008).

[5] The Court normally might be troubled by the seeming inconsistency in ERISA law that permits a plaintiff to articulate a theory of recovery for individual benefits not presented during a plaintiff's benefits appeal, but nevertheless confines judicial review to the evidence presented in the record of that benefit appeal.  But Feder Semo's insistence that it "carefully considered and dealt with the issue" resolves any such concerns here.

shareholder in March 2000.  Although the Court agrees with Feder Semo that the 1998 amendment contained an ambiguity that permitted the firm to classify Clark in either Group B or Group C, the mere presence of an ambiguity is not a "final, fully considered, and reasoned explanation for the court to evaluate.'" Hall, 559 F. Supp. at 48.  Instead, Feder Semo must point to a place in the administrative record evidencing a reasonable decision to initially classify Clark in Group C due to the ambiguity.  It has not done so.

To be sure, the Court recognizes the inherent difficulty in providing evidence explaining a decision made in 2000.  Nevertheless, it is undisputed that Feder Semo considered the precise question why Clark was classified initially in Group C during her benefit appeal in 2005.  In a November 9, 2005 email, William Anspach asks Joseph Semo and Howard Bard why a June 6, 2000 memorandum would "state that Denise and Howard are members of Class C and entitled to a 10% contribution" when they became Class A shareholders in March 2000.  See Record of Clark's Benefit Appeal at PR157.  Absent from the administrative record is any response from either Semo or Bard.  In short, the Plan's outside counsel raised the question animating Clark's improper grouping theory during her benefit appeal, but there is no evidence that Feder Semo resolved it either during the appeal or earlier.  On the basis of this record, the Court cannot conclude that Feder Semo's decision to initially classify Clark in Group C was reasonable.

Nor can the Court conclude that the firm's decision not to retroactively apply the 2003 restatement of the 1998 amendment to Clark was reasonable.  Anspach stated during Clark's benefit appeal that "[s]ince Denise was gone by [the time the 1998 amendment was corrected], the restatement does not affect her."  Record of Clark's Benefits Appeal at PR074 (Nov. 4, 2005 email from William Anspach to Joseph Semo).  But a statement of the Plan's outside attorney

does not evidence the reasons why Feder Semo adopted this position.  In fact, the record is devoid of any explanation why Clark's employment status was dispositive of whether or not she could obtain the benefits of the 2003 restatement.

Furthermore, there is evidence in the administrative record to suggest that the firm should have corrected her account credit pursuant to the 2003 restatement for at least the 2002 plan year. In Feder Semo's response to Clark's benefit appeal, the firm noted that "Howard Bard received the same [account credit] percentage as Ms. Clark" for the 2000, 2001, and 2002 plan years.  See Record of Clark's Benefit's Appeal at D0106 (Dec. 14, 2005 Response to Denise Clark's Appeal of Benefit Calculation).  Nevertheless, an individual account worksheet for Howard Bard indicates that the firm retroactively classified him in Group B for the plan year ending in 2002. See Pl.'s SOF, Exhibit 101 (Expert Report of Claude Poulin ("Poulin Report")), Exhibit G (Individual Account Credit Worksheet for Howard Bard).  Therefore, it appears from the record that, at least for the 2002 plan year, Clark and Bard were treated differently, despite Feder Semo's insistence to the contrary in its response to Clark's benefit appeal.[6]  Absent any explanation of this inconsistency, the Court cannot conclude as a matter of law that Clark was properly classified for purposes of her account credit.  It is Clark, then, and not Feder Semo and the Plan, who has the better of the improper grouping claim for individual benefits under section 1132(a)(1)(B).

## II.  Violation of ERISA's Anti-Cutback Rule

Clark next contends that Feder Semo violated ERISA's anti-cutback rule when it offered

---

[6] It is undisputed that Clark and Bard were both Class A shareholders born after January 1, 1950, and hence subject to the same classification.

her a lump sum benefit equal to only 53% of the present value of her straight life annuity.[7]

According to Clark, the Retirement Plan offered participants the option of taking their benefits as

a straight life annuity or as "a lump sum distribution equal to 100% of the present value of the

annuity benefit."  Pl.'s Opp'n at 36; see also Summary Plan Description at P0229.  But after Feder

Semo terminated the Retirement Plan in 2005, Clark submits that a participant could no longer

elect a lump sum payment equal to the present value of his annuity benefit.  Instead, a

participant's lump sum payment option was worth only 53% of the present value of the annuity.

By reducing the value of a participant's lump sum payment, Clark argues, Feder Semo violated

ERISA's anti-cutback rule.

   The Court is not persuaded.  ERISA's anti-cutback rule provides that "the accrued benefit

of a participant under a plan may not be decreased by an amendment of the plan."  29 U.S.C. §

1054(g)(1).  An accrued benefit is a particular type of benefit that is "expressed in the form of an

annual benefit commencing at normal retirement age."  Id. at § 1002(23)(A).  In other words, an

accrued benefit is an annuity.  A lump sum payment however -- the benefit at issue in Clark's

anti-cutback allegation -- "is not an accrued benefit as that term is defined in 29 U.S.C. §

1002(23)."  Steiner Corp. Ret. Plan v. Johnson & Higgins of Cal., 31 F.3d 935, 939 (10th Cir.

1994).  Instead, a lump sum payment is considered an optional form of benefit under ERISA.

See Wetzler, 586 F.3d at 1059 ("A plan participant's ability to take a lump-sum distribution of

---

   [7] Defendants suggest that Clark's anti-cutback rule claim is a component of her claim for
individual benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and therefore must be reviewed only
for reasonableness.  See Defs.' Reply in Supp. of Mot. for Summ. J. [Docket Entry 62], at 6.  Not
so.  Because Clark's anti-cutback theory alleges that Feder Semo's actions violated a statutory
provision, the Court reviews the allegation de novo.  See Wetzler v. Ill. CPA Soc. & Found. Ret.
Income Plan, 586 F.3d 1053, 1057 (7th Cir. 2009).

benefits is an 'optional form of benefit' as defined by the anti-cutback provision of ERISA.");

Steiner Corp., 31 F.3d at 939 ("[A] lump sum benefit is an optional form of benefit . . . .").

Optional forms of benefit are not explicitly protected under section 1054(g)(1).  Under 29 U.S.C.

§ 1054(g)(2)(B), however, a plan amendment "eliminating an optional form of benefit . . . [is]

treated as reducing accrued benefits." (emphasis added).[8]  Therefore, a plan amendment that

eliminates an optional form of benefit such as a lump sum payment violates the anti-cutback rule.

Here, Clark does not contend that the Retirement Plan's termination eliminated her right

to take a lump sum distribution.  Nor could she, for she in fact selected and received a lump sum

payment at the time of her distribution.  Instead, she asserts only that the Plan's termination

reduced the value of her lump sum payment.  But the plain language of section 1054(g)(2)(B)

only protects against amendments eliminating optional forms of benefits.  Amendments that

merely reduce the value of those benefits do not trigger anti-cutback protection under section

1154(g)(2)(B).  See Steiner, 31 F.3d at 940 ("ERISA [does not] equate[] the reduction of an

optional benefit with a reduction in accrued benefits, and it is only the reduction of accrued

benefits that is not permitted by the statute[].").  Hence, because the Retirement Plan's

termination did not eliminate Clark's lump sum optional benefit, it did not violate the anti-

cutback rule.

Departing from the plain language of the statute, Clark argues that a plan amendment

merely reducing the value of an optional form of benefit may also trigger ERISA's anti-cutback

rule.  To support this position, Clark points to a Department of Treasury regulation promulgated

---

[8] For purposes of the rule, a plan amendment includes changes resulting from a plan's termination.  See Treas. Reg. 1.411(d)-3(a)(1).

under 26 U.S.C. § 411(d)(6)(A) that she contends interprets the phrase "eliminating an optional form of benefit" to include reducing the value of an optional form of benefit. <u>See</u> 26 C.F.R. § 1.411(d)-4 at A-1(a).[9]  In relevant part, the regulation provides that optional forms of benefits, "to the extent they have accrued, . . . cannot . . . be <u>reduced</u>, eliminated, or made subject to employer discretion except to the extent permitted by regulations."  26 C.F.R. § 1.411(d)-4 at A-1(a) (emphasis added).

To the extent that section 1.411(d)-4 protects an optional form of benefit from a reduction in value, however, it is inconsistent with the plain language of ERISA's anti-cutback rule.  A regulation that conflicts with "the plain language of the statutory text exempts courts from any obligation to defer to it." <u>Brown v. Gardner</u>, 513 U.S. 115, 122 (1994); <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842 (1984) ("If the intent of Congress is clear, that is the end of the matter . . . ."); <u>Am. Fed'n of Gov't Employees, AFL-CIO v. Gates</u>, 486 F.3d 1316, 1321-22 (D.C. Cir. 2007) ("If the relevant statutory language is plain but is inconsistent with the DoD regulations, we must hold the regulations invalid.").

By its terms, 29 U.S.C. § 1054(g)(2)(B) confirms that only plan amendments "eliminating an optional form of benefit . . . shall be treated as reducing accrued benefits."  Had Congress intended for the anti-cutback rule to prohibit plan amendments merely reducing the value of an optional form of benefit as well, it could have included language to that effect in section 1054(g)(2)(B).  Indeed, Congress did just that in section 1054(g)(2)(A), a provision of the anti-

---

[9] Section 411(d)(6) is in all material respects identical to ERISA's anti-cutback rule, and the regulations promulgated under it are equally applicable to ERISA's anti-cutback rule.  <u>See</u> 53 Fed. Reg. 26050, 26053 (July 11, 1988) ("The regulations under section 411 are also applicable to provisions of [ERISA] Title I.");  <u>accord</u> <u>Cent. Laborers' Pension Fund v. Heinz</u>, 541 U.S. 739, 747 (2004).

cutback rule regarding early retirement benefits.[10]  There, Congress stated that "a plan

amendment which has the effect of eliminating <u>or reducing</u> an early retirement benefit or a

retirement-type subsidy . . . shall be treated as reducing accrued benefits."  29 U.S.C. §

1054(g)(2)(A) (emphasis added).  The absence of similar "or reducing" language in section

1054(g)(2)(B) clearly indicates that Congress did not intend to equate the reduction of an

optional form of benefit with the reduction of accrued benefits.  Because the anti-cutback rule

only protects against the reduction of accrued benefits, that the Plan's termination may have

reduced the value of Clark's optional form of benefit does not trigger anti-cutback protection.

Summary judgment therefore is appropriate for the defendants on Clark's anti-cutback theory.[11]

### III.    Derivative Breach of Fiduciary Duty Allegations

Clark's final two theories of recovery -- the Retirement Plan's fiduciaries (1) used

improper actuarial and interest rate assumptions to fund the plan and (2) violated various

regulations by permitting two distributions to Plan participants -- are derivative breach of

fiduciary duty allegations.  For purposes of a breach of fiduciary duty claim, "plan fiduciaries are

held to a 'prudent man' standard."  <u>Foltz v. U.S. News & World Report, Inc.</u>, 627 F. Supp. 1143,

1170 (D.D.C. 1986); <u>see also</u> 29 U.S.C. § 1104(a)(1)(B) (fiduciary shall discharge duties "with

---

[10] Neither party contends that Clark's lump sum payment is an "early retirement benefit."

[11] In her complaint, Clark also alleges that Feder Semo violated ERISA's disclosure requirements by failing to include required information in the Retirement Plan's summary plan description.  At the motions hearing, however, she indicated that this allegation was not an independent basis of recovery, but instead supported her anti-cutback theory.  Accordingly, because the Court has dismissed recovery under the anti-cutback rule, it is appropriate to dismiss her disclosure allegation as well.  In any event, even were Clark's non-disclosure allegation an independent basis for recovery, she has not alleged any injury resulting from the purported non-disclosure.

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").  It is an objective standard in which the fiduciaries "are to be judged 'according to the standards of others acting in a like capacity and familiar with such matters.'"  Katsaros v. Cody, 744 F.2d 270, 280 (2d Cir. 1984) (quoting Marshall v. Glass/Metal Ass'n, 507 F. Supp. 378, 384 (D. Haw. 1980)).

A.      Improper Actuarial and Interest Rate Assumptions

Clark contends that the Retirement Plan's fiduciaries breached their duty by using an incorrect actuarial assumption to determine how much the firm had to contribute to the Plan. According to her, the Retirement Plan's fiduciaries funded the Plan based on the assumption that most participants would take their benefits as an annuity at normal retirement age.  See Pl.'s Opp'n at 21.  This was in error, she suggests, because only two individuals took their retirement benefits at retirement age, while other participants took their benefits as a lump sum payment significantly before retirement age.  See id.  In her view, the Plan fiduciaries' failure to account for how participants ultimately took their benefits produced an underfunded Plan, thereby resulting in a decrease to a participant's lump sum payment.

Clark's argument presumes the fiduciaries' actuarial assumption was incorrect because most participants ended up taking their benefits before reaching retirement age.  But that is not the correct perspective from which to view the fiduciaries' decision regarding the Plan's actuarial assumption.  Indeed, participants took early benefits only because Feder Semo ceased operation and hence terminated the Plan and distributed all of its assets, an outcome that the Plan fiduciaries could not have anticipated.  Instead, Clark can only prevail on her actuarial

-18-

assumption theory by demonstrating that the actuarial assumption was incorrect in light of the Plan's performance before the firm dissolved. Or, put another way, she can prevail only if she shows that other experienced individuals would have adopted a different actuarial assumption given the facts that were before the Plan's fiduciaries before the firm dissolved.

She has not done so.[12] Clark offers only the expert opinion of Claude Poulin, who suggests that the fiduciaries' actuarial assumption was imprudent because their assumptions ignored the fact that most Retirement Plan participants took their benefits early. See Poulin Report at ¶ 15. But this opinion merely repeats Clark's incorrect premise based on hindsight: that the fiduciaries had to use an actuarial assumption that accounted for the firm's future dissolution. Poulin does not demonstrate, as he must, that the fiduciaries' actuarial assumption was incorrect in light of how the Plan was performing prior to its termination. Put simply, Clark has provided no evidence to suggest that the Plan fiduciaries' actuarial assumption was inconsistent with the actuarial assumption that another individual "acting in a like capacity and familiar with such matters" would have adopted in the same context. Katsaros, 744 F.2d at 280. Summary judgment for defendants is therefore appropriate on Clark's actuarial assumption theory.

Clark's allegation that the fiduciaries breached their duty by funding the Retirement Plan based on an improper interest rate assumption fares no better. See Pl.'s Opp'n at 22. Clark observes that after September 30, 2001, market interest rates dropped, which had the effect of

---

[12] As an initial matter, defendant' rebuttal expert, Ian Altman, avers that "in small plans, where the liabilities are focused on a limited number of principals, a single retirement age assumption is sufficiently accurate as to be acceptable for ERISA purposes." Defs.' SOF, Exhibit 15 (Expert Report of Ian Altman), 6. That is, according to Altman, it was not a breach of duty for the Plan's fiduciaries to use a single actuarial assumption -- here that participants would take their benefits at retirement age -- to determine how to fund the Plan. Clark does not dispute this conclusion.

increasing the value of a participant's potential lump sum benefit.[13]  See id.  At the same time, however, she contends that the fiduciaries did not lower the Plan's interest rate assumption, with the result that "the Plan's interest [rate] assumption . . . increasingly diverged from market rates."  Id.  According to Clark, this resulted in significant underfunded liabilities for the Plan because on its termination all participants elected to take a lump sum payment before retirement age.

Once again, however, Clark's argument proceeds from an incorrect premise.  She cannot demonstrate a breach of fiduciary duty merely by pointing out the fact that the Plan was underfunded on its termination -- ERISA's prudent man standard does not require prescience.  Rather, she must show that the fiduciaries made incorrect decisions about the Plan's interest rate assumption based on the facts presented to them prior to the Plan's termination.  Clark has not done so.  To be sure, she does suggest that "interest rates dropped after 9/30/2001 and there is a continuing duty to review such assumptions."  Id.  But even to the extent that statement alleges that the fiduciaries acted imprudently, it does not demonstrate what decisions they made that were incorrect measured against the objective standard governing fiduciaries.  In any event, such a "conclusory allegation[] unsupported by factual data will not create a triable issue of fact."  Byrd v. Envt'l Prot. Agency, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999).[14]

_____

[13] A participant's lump sum payment was calculated by discounting the total value of that participant's lump sum annuity by the prevailing market interest rate.  Accordingly, when rates decreased, the value of the lump sum payment increased.  See Record of Clark's Benefit Appeal at D0022 (Sept. 30, 2005 letter from Feder Semo to Denise Clark).

[14] Even were the Court to credit Clark's conclusory allegation, she does not explain how the fiduciaries could have breached their fiduciary duty when Clark herself, who was Plan fiduciary through May 2002, raised the interest rate assumption after September 30, 2001.  See Anspach Dep. 184:20-185:2.  Nor does Clark assert that the facts the fiduciaries analyzed in determining the interest rate assumption changed after she ceased to be a fiduciary.  Quite the opposite: her only allegation is that all of the facts necessary for the Plan's fiduciaries to decide to

B.      Violation of 26 C.F.R. § 1.401(a)(4)-5

Clark's final contention is that the Retirement Plan's fiduciaries breached their duty to the

Plan by making two distributions to Plan participants: a December 2002 distribution to Loretta

Feder and a November 2005 distribution to Gerald Feder.[15]  The Court takes each in turn.

The Retirement Plan's fiduciaries made a lump sum payment of $381,901.00 to Loretta

Feder in December 2002.  Clark contends that this distribution violated 26 C.F.R. § 1.401(a)(4)-

5, a Treasury regulation that restricts the lump sum payments available to highly compensated

employees unless "[a]fter taking into account payment to . . . the restricted employee of all

benefits payable to . . . that restricted employee under the plan, the value of plan assets must

equal or exceed 110 percent of the value of current liabilities."  26 C.F.R. § 1.401(a)(4)-

5(b)(3)(iv)(A).

Based on this regulation, Clark asserts that the distribution to Loretta Feder "left the

Plan's funding even farther short of 110% of the current liabilities in the plan year ending

September 30, 2003 [sic]."  Pl.'s Opp'n at 29.  The undisputed evidence, however, demonstrates

that Loretta Feder's distribution satisfied 26 C.F.R. § 1.401(a)(4)-5.  In a December 2002 fax

from Dennis Reddington to Feder Semo, Reddington calculated the then-current assets and

---

lower the Plan's interest rate assumption were in place in September 2001.

[15] Clark suggests in her brief that an April 2002 distribution to Gerald Feder was also a
breach of fiduciary duty.  But to the extent she presses this claim, neither Joseph Semo nor
Howard Bard are liable, as they did not become fiduciaries of the Plan until after May 2002.  See
29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty
under this subchapter if such breach was committed before he became a fiduciary or after he
ceased to be a fiduciary.").  Rather, Clark was herself the fiduciary of the Retirement Plan in
April 2002, and therefore she was responsible for making that distribution to Feder.  See Defs.'
SOF, Exhibit 4 (deposition of Denise Clark), 18:17-20.

liabilities of the Retirement Plan.  See Pl.'s SOF, Exhibit 116.  He determined that the Plan's assets before the payment to Loretta Feder equaled $1,205,792.86, and that 110% of the Plan's liabilities equaled $808,669.00, figures that Clark does not challenge.  See id.  Reddington therefore concluded that Loretta Feder could take her distribution of $381,901.00 without violating section 1.401(a)(4)-5.  Because there remained funds exceeding 110% of liabilities after the December 2002 distribution to Loretta Feder, that distribution does not support Clark's breach of fiduciary duty claim.

The Plan's fiduciaries also made a lump sum payment to Gerald Feder of $229,949.00 in November 2005, which Clark argues violated an Internal Revenue Code ruling regarding distributions made to certain "highly compensated employees."  See Pl.'s Opp'n at 29-30 (citing Rev. Rul. 92-76 (Aug. 31, 1992).  According to Clark, Revenue Ruling 92-76 prohibited the distribution to Gerald Feder in November 2005 because the ruling requires "that the 'accumulated amount of distributions' to both Mr. and Mrs. Feder less any 'unrestricted' amounts . . . be computed for comparison with the distributions being made to other participants on termination." Pl.'s Opp'n at 29-30.  Clark therefore opines that because "Mr. and Mrs. Feder had already received almost 80% of the value of their benefits," Revenue Ruling 92-76 prohibited "an additional distribution to Mr. Feder when other plan participants were relegated to receiving only 53% of the value of their benefits."  Id. at 30.

Revenue Ruling 92-76, however, is inapposite to Clark's argument.  By its plain terms, the ruling did not analyze whether a particular individual's distributions in past years affect the permissible amount of that individual's distribution in later years.  Rather, the ruling considered whether a retirement plan that permitted distributions that nominally violated 26 C.F.R. §

1.401(a)(4)-5 were nevertheless permissible because the plan included "adequate provisions to secure any necessary repayment in the event of a plan termination."  Rev. Rul. 92-76.  And it discussed the impact that 26 C.F.R. § 1.401(a)(4)-5 had on plans that had placed restrictions on distributions to certain highly compensated employees pursuant to previously-promulgated regulations at 26 C.F.R. § 1.401-4.  See Rev. Rul. 92-76.  Neither of these subjects, however, encompasses Clark's allegation, and she points to no other support for her challenge to the distribution.  Summary judgment is therefore appropriate on Clark's allegation that the fiduciaries breached their duty by approving the December 2002 distribution to Loretta Feder and the November 2005 distribution to Gerald Feder.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part defendants' motion for summary judgment.  A separate Order accompanies this Memorandum Opinion.

_____/s/_____

John D. Bates

United States District Judge

Dated: March 22, 2010