**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DENISE M. CLARK,**

   **Plaintiff,**

      v.

**FEDER, SEMO & BARD, P.C., et al.,**

   **Defendants.**

---

**Civil Action No.  07-0470 (JDB)**

**MEMORANDUM OPINION**

Plaintiff Denise Clark brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., against the law firm Feder, Semo & Bard ("Feder Semo"), the Feder Semo Retirement Plan and Trust ("Retirement Plan" or "Plan"), and two former trustees of the Retirement Plan, Joseph Semo and Howard Bard.  On March 22, 2010, the Court granted summary judgment for defendants on all but plaintiff's improper grouping claim.  Clark v. Feder Semo & Bard, P.C., 697 F. Supp. 2d 24 (D.D.C. 2010) ("Clark II").  On September 13, 2010 the Court issued its decision on reconsideration, which vacated the partial grant of summary judgment in favor of defendants and required the plaintiff to "precisely detail[] the nature of her remaining claims."  Clark v. Feder Semo & Bard, P.C., 736 F. Supp. 2d 222, 225 (D.D.C. 2010) ("Clark III").  Now before the Court is defendants' renewed motion for summary judgment as to Clark's five claims ("Def.'s Mot.") [Docket Entry #90].  The parties, and the Court, are by now quite familiar with the facts animating this action.  See Clark v. Feder Semo & Bard, P.C. 527 F. Supp. 2d 112, 114-15 (D.D.C. 2007) ("Clark I"); Clark II, 697 F. Supp. 2d at 26-29.  Upon careful consideration of the parties' memoranda, the applicable law,

and the entire record herein, and for the reasons set forth below, the Court will grant in part and deny in part defendants' motion.

<u>ANALYSIS</u>

In Plaintiff's Statement Detailing Nature of Claims ("Pl.'s Statement") [Docket Entry #87], Clark asserts five theories of recovery.  First, she contends that Feder Semo improperly grouped her for purposes of her account credit, thereby understating her retirement benefits by 41%.  <u>See</u> Pl.'s Statement at 1.  Second, she submits that Feder Semo violated ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), when it proportionately reduced the aggregate amount distributed to Plan participants to match the Plan's assets.  <u>Id.</u> at 5-6.  Third, she contends that defendants violated ERISA's disclosure requirements by failing to disclose the consequences of a plan termination and the Plan's lack of insurance.  <u>Id.</u> at 7-8.  Fourth, she argues that the Retirement Plan's fiduciaries failed to use a reasonable actuarial assumption for interest that caused the Plan to be underfunded.  <u>Id.</u> at 13-14.  And fifth, she contends that the Retirement Plan's fiduciaries failed to comply with the distribution restrictions in Treas. Reg. 1.401(a)(4)-5 with the effect of reducing the benefits received by most plan participants.  <u>Id.</u> at 17.  The Court will address each claim in turn.

I.   <u>Improper Grouping</u>

Plaintiff contends that she was improperly classified in the Retirement Plan in "Group C" rather than "Group B," which resulted in the receipt of smaller percentage credits from the Plan. Pl.'s Statement at 2-3.  Those classified in Group C received 20% allocations whereas those classified in "Group B" received only 10% allocations. <u>Id.</u>  The Court ruled previously that plaintiff "had the better of the improper grouping claim," because defendants were aware of

Clark's grouping in a less advantageous category and failed to provide a reasonable explanation

for why she was initially classified in Group C and then her benefits were not adjusted prior to

the disbursement of Plan assets upon its termination.  See Clark II, 697 F. Supp. 2d at 30-33.  On

reconsideration, the Court explained further its decision that Clark could only proceed on her

improper grouping claim under 29 U.S.C. § 1132(a)(1)(B), and ruled that defendants' arguments

that plaintiff's improper grouping claim was non-justiciable lacked support.   Clark III, 736 F.

Supp. 2d at 227-28.

Now, plaintiff brings this claim under 29 U.S.C. § 1132(a)(1)(B) against the Plan and

under § 1132 (a)(3) for breach of fiduciary duty against Semo and Bard, the "fiduciaries who

decided not to correct her benefit before distributing the Plan's assets," to the extent that

"monetary recovery for that violation is unavailable because the Plan's assets have been

distributed."  Pl.'s Statement at 3.  Defendants argue, in a variation on their previous justiciability

argument, that plaintiff (1) lacks constitutional standing to pursue an improper grouping claim

against the defunct Plan, and (2) lacks statutory standing to raise a legal (rather than equitable)

claim for improper grouping against individual defendants Semo and Bard under § 1132(a)(3).

Both arguments are unpersuasive.

A.    Article III Standing

Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the

resolution of 'cases' and 'controversies,'" Valley Forge Christian Coll. v. Am. United for

Separation of Church and State, Inc., 454 U.S. 464, 471 (1982), and the doctrine of standing

serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in

Article III," Lujan  v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "As an aspect of

justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)); see also Sierra Club v. Morton, 405 U.S. 727, 731-32 (1972).

Standing doctrine encompasses "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth, 422 U.S. at 498.  To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560-61 (internal quotation marks and citations omitted).  "Redressibility examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff." Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc).  Defendants contend that because the Plan's assets were distributed and the plan has terminated, plaintiff's injury is not redressible since "the Court cannot fashion any relief for Clark." Defs.' Mot. at 13.  Plaintiffs maintain that the state of the Plan is a material fact in dispute.  Pl.'s Opp'n at 7.

As the Court explained previously, defendants' theory "improperly conflates standing with a plaintiff's ability to recover damages from a defendant." See Clark II, 736 F. Supp. 2d at 227-28.  The D.C. Circuit has explained that "[t]he appellants need not negate every conceivable impediment to effective relief no matter how speculative, nor are they required to prove that

granting the requested relief is certain to alleviate their injury." Int'l Ladies Garment Workers v. Donovan, 722 F.2d 795, 811 (D.C. Cir. 1983) (citations omitted).  If the Plan lacks sufficient assets, Clark may ultimately not recover the benefits she seeks.  But precluding her from pursuing a claim for these benefits at this stage is not appropriate.  See N. Carolina Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 84 (D.D.C. 2007) ("[E]ven if the relief that plaintiffs ultimately obtain constitutes a 'Pyrrhic' victory, the Court *could* award them relief that would remove the source of their injury."); Graden v. Conexant Sys., Inc., 496 F.3d 291, 301 (3d Cir. 2007) (explaining that practically, "it may be that . . . [an ERISA] plan, *though liable*, would be judgment proof" as to plaintiff's § 1132(a)(1)(B) claim for benefits because of plan fund allocation requirements).

    The cases on which defendants rely involve redressibility issues inapposite to the facts here.  In Paulsen v. CNF, Inc., 559 F.3d 1061, 1073 (9th Cir. 2009), the Ninth Circuit ruled that plaintiff beneficiaries lacked standing against a plan -- covered by the PBGC -- that had distressed terminated with inadequate assets.  There, the plaintiffs' claims were not redressible by the plan because plaintiffs were only entitled to recover outstanding amounts from PBGC, which in turn was obligated only to pay the plaintiffs the statutory minimum.  Paulsen, 59 F.3d at 1073.  And in Hall v. LHACO, Inc., 140 F.3d 1190, 1196 (8th Cir. 1998), the Eighth Circuit ruled that a plaintiff's claim against a former plan administrator was not redressible because the former plan administrator lacked authority to pay out plan benefits.  Unlike in Paulsen and Hall, plaintiff's claims here are not circumscribed by statute or limited by an administrator's authority to grant the relief sought.  The Plan clearly has the authority to pay out Plan benefits.  Furthermore, even if a beneficiary's ultimate recovery is uncertain, the beneficiary may sue a terminated pension plan.

See, e.g., Pfahler v. Nat'l Latex Products Co., 517 F.3d 816, 827 (6th Cir. 2007) ("[N]othing in

the plain language of § 502(a)(2) suggests that a plaintiff's ability to recover under that provision

is contingent upon a plan's being active at the time of suit."); Wilmington Shipping Co. v. New

England Life Ins. Co, 496 F.3d 326, 337-38 (4th Cir. 2007) (ruling that a plan participant can sue

for breach of fiduciary duty after plan termination); cf. Harris v. AMGEN, Inc., 573 F.3d 728,

735-36 (9th Cir. 2009) (ruling that there was "no lack of redressability merely because a

plaintiff's recovery under § 502(a)(2) might go first to the defined contribution plan rather than

directly to the plaintiff").[1]  Hence, plaintiff has Article III standing to pursue her improper

grouping claim against the Plan.

    B.    Statutory Standing

    Plaintiff contends that "[i]f a monetary recovery for the [§ 1132(a)(1)(B)] violation is

unavailable because the Plan's assets have been distributed, the fiduciaries who decided not to

correct her benefit calculation before distributing the Plan's assets can be held responsible under

[§ 1132(a)(3)] for breach of fiduciary duty." Pl.'s Statement at 3.  First, this Court has already

ruled that a plaintiff may not proceed with claims under both § 1132(a)(1)(B) and § 1132(a)(3).

Clark I, 527 F. Supp. 2d at 116-17.  This Court relied on Variety Corp. v. Howe, 516 U.S. 489

(1996), in which the Supreme Court concluded that §1132(a)(3) is a "catchall" provision that acts

"as a safety net, offering appropriate equitable relief for injuries caused by violations that

[§1132(a)] does not elsewhere adequately remedy," 516 U.S. at 512.  The plaintiffs in Variety

---

    [1]Defendants contend that plaintiff improperly relies on cases that permit participants to
sue a pension plan fiduciary -- not a pension plan itself -- after plan termination.  Def.'s Reply at
3-4. Yet defendants cite no cases that indicate a pension plan may not be sued after termination.
Indeed, this may be because "[u]sing a § 1132(a)(1)(B) suit to force the plan to use money
already allocated to others' accounts [or distributed to others] . . . . would present a host of
difficulties with which few sensible plaintiffs would want to contend."  Graden, 496 F.3d at 301.

Corp. could not proceed under § 1132(a)(1) because they were no longer plan beneficiaries, nor

under § 1132(a)(2), which does not provide relief for individual beneficiaries, so they "must rely

on the third subsection, [§ 1132(a)(3)], or they ha[d] no remedy at all." Id. at 515. The Court in

Variety Corp. explained that "where Congress elsewhere provided adequate relief for a

beneficiary's injury, there will likely be no need for further equitable relief." Id.

Following Variety Corp., the majority of circuits that have decided this issue have held

that a breach of fiduciary duty claim cannot stand where a plaintiff has an adequate remedy

through a claim for benefits under § 1132(a)(1)(B).  See, e.g., Korotynska v. Metro. Life Ins. Co.,

474 F.3d 101, 107 (4th Cir. 2006) (holding that "§ 1132(a)(1)(B) affords the plaintiff adequate

relief for her benefits claim, and a cause of action under § 1132(a)(3) is thus not appropriate");

Antolik v. Saks, Inc., 463 F.3d 796, 803 (8th Cir. 2006) ("[W]here a plaintiff is provided

adequate relief by the right to bring a claim for benefits under ... § 1132(a)(1)(B), the plaintiff

does not have a cause of action to seek the same remedy under § 1132(a)(3)(B).") (quotation

omitted); Tolson v. Avondale Indus., Inc., 141 F.3d 604, 610 (5th Cir. 1998) ("Because [plaintiff]

has adequate redress for disavowed claims through his right to bring suit pursuant to section

1132(a)(1), he has no claim for breach of fiduciary duty under section 1132(a)(3).").  But see

Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89-90 (2d Cir. 2001) (holding that

"Varity Corp did not eliminate a private cause of action for breach of fiduciary duty when another

potential remedy is available; instead the district court's remedy is limited to such equitable relief

as is considered appropriate").  Courts in this district have likewise ruled that a plaintiff may

proceed under either § 1132(a)(1)(B) or § 1132(a)(3), but not both.  See Wright v. Metro. Life

Ins. Co., 618 F. Supp. 2d 43, 55 (D.D.C. 2009) (ruling that "a breach of fiduciary duty claim

cannot stand where a plaintiff has an adequate remedy through a claim for benefits under §

1132(a)(1)(B)"); Crummett v. Metro. Life Ins. Co., 2007 WL 2071704, at *3 (D.D.C. July 16,

2007) (concluding "with little hesitancy that [plaintiff's] remedies pursuant to subsection (1)(B)

are adequate and that her fiduciary-duty claim must be dismissed"); Hurley v. Life Ins. Co. of N.

Am., 2005 U.S. Dist. LEXIS 43038, at *32 (D.D.C. July 7, 2005) (concluding that "the claim for

ERISA breach of fiduciary duty [under §1132(a)(2)] is preempted by the existence of a valid

claim in Count I for denial of benefits").

　　　　Hence, this Court ruled that "[b]ecause the gravamen of plaintiff's complaint is that she

was improperly denied benefits, the remedies under [§ 1132(a)(1)(B)] would make plaintiff

whole if she were to prevail on her claim.  Plaintiff therefore has an adequate remedy under

[§ 1132(a)(1)(B)], and accordingly her [§ 1132(a)(3)] claim must be dismissed." Clark I, 527 F.

Supp. 2d at 17.  Concerned that the Plan lacked assets, and would therefore leave Clark without

an "adequate remedy" under § 1132(a)(1)(B), Clark maintained that "she should [also] be

allowed to proceed under section 1132(a)(3)." Clark III, 736 F. Supp. 2d at 228 n.5.  The Court

did not address this issue fully in its decision on reconsideration when it determined that Clark

had standing to "go forward on her section 1132(a)(1)(B) claim." See id.  Plaintiff now again

urges that to the extent "monetary recovery for that violation is unavailable because the Plan's

assets have been distributed," she may also proceed under § 1132(a)(3) against plan fiduciaries

for breach of duty. See Pl.'s Statement at 3.  Not so.  Plaintiff must choose.  If, because the Plan

is terminated and lacks assets (which plaintiff currently maintains is a material fact in dispute),

plaintiff does not have an adequate remedy under § 1132(a)(1)(B), then plaintiff may pursue a

claim under § 1132(a)(3) instead of her inadequate claim under § 1132(a)(1)(B).  Hence, the

Court will permit Clark to proceed on a claim under either § 1132(a)(1)(B) or § 1132(a)(3), but not both.

Defendants contend that in any event Clark may not proceed under § 1132(a)(3) because that section only provides for "appropriate equitable relief," and Clark "seeks to impose personal liability for money damages on Semo and Bard." Defs.' Mot. at 14-15.  The Supreme Court's recent decision, CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), is instructive here.  In CIGNA, the district court ruled that CIGNA failed to properly notify its employees -- and defined-benefit retirement plan beneficiaries -- of changes to their benefits.  See 131 S. Ct. at 1872.  For relief, the court reformed the new plan, providing benefits according to the terms of the old plan when it was favorable to the plaintiffs, and ordered CIGNA to pay benefits accordingly.   Id. at 1871. The district court ruled that § 1132(a)(1)(B) provided authority to reform the plan and noted that Supreme Court precedent indicated that such relief would not be available under § 1132(a)(3). Id. at 1876.  The Supreme Court reversed, holding that § 1132(a)(1)(B) did not authorize the district court's reformation of CIGNA's pension plan, but the Court then explained that § 1132(a)(3) could permit the district court to fashion similar equitable relief.  Id. at 1878-80.

The CIGNA Court provided examples of "appropriate equitable relief" that a beneficiary might obtain against a plan fiduciary under § 1132(a)(3), id. at 1878, and distinguished its prior cases that interpreted "appropriate equitable relief" in a more narrow fashion, see, e.g., Sereboff v. Mid Atlantic Med. Srvs., 547 U.S. 356 (2006); Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002). In particular, the Court explained that simply because a plaintiff is seeking monetary relief for a breach of fiduciary duty "does not remove it from the category of traditionally equitable relief." Id. at 1880. Indeed, "[e]quity courts possessed the power to

provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." Id. The Court noted that "[t]he surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." Id. Here, Clark has demonstrated that defendants Semo and Bard were aware of her grouping in a less advantageous category and failed to provide a reasonable explanation for why she was so classified and why her benefits were not adjusted prior to the disbursement of Plan assets upon its termination. See Clark II, 697 F. Supp. 2d at 30-33. These facts support Clark's claim for breach of fiduciary duty under § 1132(a)(3), which is not precluded by the statutory limitation to "appropriate equitable relief." Hence, summary judgment for defendants on the improper grouping claim is denied. However, as explained above, Clark may proceed only under § 1132(a)(1)(B) or § 1132(a)(3), not under both provisions.

## II.   ERISA § 204(g) Anti-Cutback Claim

Plaintiff contends that all defendants breached ERISA's "anti-cutback" rule, 29 U.S.C. § 1054(g), and Feder Semo and individual defendants Semo and Bard breached their fiduciary duty when they violated the anti-cutback rule. Pl.'s Statement at 5. In particular, Clark alleges that she "had a right to the distribution of the present value of her annuity. . . [and a]fter the amendment terminating the plan, that right disappeared." Pl.'s Opp'n at 22. Instead of the present value of her annuity, she was offered an amount that "had been pro rata reduced to match the Retirement Plan's assets." See Clark II, 697 F. Supp. 2d at 29. The anti-cutback rule states that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." § 1054(g)(1). The anti-cutback rule prohibits, subject to certain exceptions, "eliminating or reducing an early retirement benefit or retirement-type subsidy," § 1054(g)(2)(A)

or "eliminating an optional form of benefit," § 1054(g)(2)(B).  A plan beneficiary's ability to

select her benefits as a lump sum payment, or as some other form of distribution, "is an 'optional

form of benefit' as defined by the anti-cutback provision of ERISA." Wetzler v. Ill. CPA Soc. &

Found. Ret. Income Plan, 586 F.3d 1053, 1059 (7th Cir. 2009).  And it is that choice that the

anti-cutback rule protects from elimination. See 29 U.S.C. § 1054(g)(2)(B).  On reconsideration,

this Court vacated its grant of summary judgment for defendants on Clark's anti-cutback rule

claim because the Court had earlier incorrectly concluded that a lump sum payment is not an

accrued benefit as that term is defined in 29 U.S.C. § 1002(23).  Clark III, 736 F. Supp. 2d at

230.

 Defendants now make several new arguments for dismissal of Clark's anti-cutback claim:

that (1) plaintiff lacks standing and (2) terminating the plan is a "settlor" rather than "fiduciary"

function; and that here, (3) a plan "amendment" did not violate the anti-cutback rule.  Defendants'

standing argument fails for the reasons already discussed above.  The "settlor" versus "fidiciary"

argument does not aid defendants.  Indeed, an employer's decision to modify or terminate an

ERISA plan is a "settlor" rather than "fiduciary" function, see Beck v. PACE Int'l Union, 551

U.S. 96, 101 (2007), but the question here is whether the company "d[id] so in a permissible

manner" under ERISA, see Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995).

Hence, if defendants' violated the anti-cutback rule when terminating the plan, Clark may have a

claim for breach of fiduciary duty.

 Defendants' argument that Clark cannot point to an amendment that caused the reduction

of her accrued benefit is more persuasive.  Defendant's third argument proceeds as follows:  the

decision to terminate the Plan was a plan amendment (so therefore potentially subject to the anti-

cutback rule), but the termination itself did not reduce or eliminate Clark's accrued benefit

amount.  See Stewart v. Nat'l Shopmen Pension Fund, 730 F.2d 1552, 1563 (D.C. Cir. 1994)

(explaining that the plain language of the anti-cutback provision applies only to "amendments of

the plan," not "every reduction in benefits").  Instead, defendants' continue, the decision to

terminate the plan simply activated the plan's existing termination provision (section 14.6(g)) that

required the pro rata distribution of Plan benefits.  Defs.' Mot. at 18-19.  To be sure, defendants'

acknowledge, the termination had the effect of reducing the amount of money that Clark received

upon distribution.  Def.'s Reply at 10.  But defendants contend that termination did not decrease

the amount of her "accrued benefit" because the Plan used Clark's (100%) accrued benefit

amount as the basis for what she would eventually receive in a pro rata distribution.  Id. at 20.

Instead, the "cause" of Clark receiving less than 100% of her accrued benefit was the

underfunding of the Plan and Plan section 14.6(g), which permitted pro rata distribution of the

available benefits; the termination of the plan just meant that she would receive her full accrued

benefit -- to the extent the Plan had funds and consistent with section 14.6(g).

　　　Plaintiff is correct that "[a] plan amendment includes changes resulting from a plan's

termination."  Clark II, 697 F. Supp. 2d at 34 n.8 (citing Treas. Reg. 1.411(d)-3(a)(1)).  And,

construing § 1002(23) and § 1054(c)(3) in relation to the anti-cutback rule, the Second Circuit

has explained that "the accrued benefit under a defined benefit plan must be valued in terms of

the annuity that it will yield at normal retirement age; and [] if the benefit is paid at any other

time (e.g., on termination rather than retirement) or in any other form (e.g., a lump sum

distribution, instead of annuity) it must be worth at least as much as that annuity."  Esden v. Bank

of Boston, 229 F.3d 154, 163 (2d Cir. 2000); see also United States v. Novak, 476 F.3d 1041,

1061 (9th Cir. 2007) (en banc) ("[T]he accrued benefit is a right to the annual payments promised

by the terms of the plan or, if the plan provides the option of receiving a lump sum payment in

lieu of those annual payments, to their actuarial equivalent.").  Plaintiff contends that she was

informed in early September 2005 that she was eligible under the Plan to receive a lump sum

distribution equal to the "actuarial value of your vested Accrued Benefit."  Pl.'s Statement at 5.

Then, on September 30, 2005, she was informed that the Plan was being terminated and that her

lump sum distribution was $166,541.71 – less than the "actuarial value of [her] vested Accrued

Benefit."  Pl.'s Opp'n at 22; Pl.'s Statement at 5.  Hence, plaintiff contends that the Plan

termination -- i.e., "amendment" -- had the ultimate effect of reducing the amount of her accrued

benefits and hence violated the anti-cutback rule.

      Clark's argument is not without force.  But her claim is not the type of benefit reduction

that the anti-cutback statute protects.  Indeed, a typical anti-cutback case is where an amendment

changes the terms of a plan -- for example, the method of calculating partial pension benefits, the

rate at which a plaintiff's benefits accrue, or expanding a plan's definition of disqualifying

employment for early retirement beneficiaries -- to the detriment of the plaintiff.  See, e.g., Cent.

Laborers' Pension Fund v. Heinz, 541 U.S. 739, 746 (2004);  Hoover v. Cumberland, Md. Area

Teamsters, 756 F.2d 977, 983-84 (3d Cir. 1985).  Here, Clark cannot point to terms of the Plan

that were changed as a result of the plan termination.  Indeed, Plan section 14.6(g), which

permitted pro rata distribution of the available benefits, was not changed or invoked because the

Plan terminated.  That section went into effect because the Plan was underfunded.  See Dooley v.

Am. Airlines, Inc, 797 F.2d 1447, 1451 (7th Cir. 1986) (applying Stewart's "commonsensical rule

of law" to find that plan fiduciaries' "valid exercise of a provision which was already firmly

ensconced in the pension document" did not amount to amendment of the plan in violation of

section 204(g).   Moreover, plaintiff does not cite to any cases where termination of an

underfunded plan -- which cannot pay out the full amount to plan beneficiaries -- triggers the

anti-cutback rule.[2]  See Pl.'s Opp'n at 22; see also Hollowell v. Cincinnati Ventilating Co., 711 F.

Supp 2d 751, 766 (E.D. Ky. 2010) ("ERISA's anti-cutback provision is not triggered via

termination of a prior plan and its subsequent failure to pay vested benefits. To the extent

Plaintiff seeks to state a claim based on termination of the plan, rather than amendment, ERISA §

204(g) is not implicated."); Herman v. Cent. States Southeast & Sw. Areas Pension Fund, 423

F.3d 684, 692 (7th Cir. 2005) (an amendment that does not render any person ineligible for

benefits for which he or she was previously eligible does not violate the anti-cutback provision).

Ultimately, Clark's benefit was reduced because the Plan lacked sufficient assets to pay her full

benefit, not because an amendment "eliminat[ed] or reduc[ed] an early retirement benefit or

retirement-type subsidy," § 1054(g)(2)(A), or "eliminat[ed] an optional form of benefit," §

1054(g)(2)(B).  Hence, summary judgment for defendants on Clark's anti-cutback claim is

granted.

   III.   Summary Plan Description Claim

   Clark alleges that the Retirement Plan's summary plan description ("SPD") fails to

disclose two pieces of information required by the Department of Labor's ERISA regulations: (1)

a statement whether the plan is insured by the Pension Benefit Guaranty Corporation ("PBGC"),

and, if it is not, the reasons for the lack of insurance, see 29 C.F.R. § 2520.102-3(m); and (2) a

---

[2]   At the motions hearing on June 30, 2011, plaintiff's counsel also noted that he was not aware of any case that involved an anti-cutback claim when insufficient funds resulted in the reduction of a benefit.

statement "clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits," id. § 2520.102-3(l). Plaintiff contends that the SPD controls in the event of a conflict with the text of the Plan – and that the Court may order relief based on the representations in the SPD under 29 U.S.C. § 1132(a)(1)(B).  Pl.'s Mot. at 24-26.  Defendants argue that any failure to disclose was a mere "technical violation," and that plaintiff cannot demonstrate that the SPD conflicts with the terms of the Plan. Defs' Mot. at 22.

In CIGNA, which was decided after the parties completed summary judgment briefing, the Supreme Court ruled that because the SPD is not part of an ERISA plan, a plan participant or beneficiary may not recover for misrepresentations in a SPD under ERISA § 1132(a)(1)(B). CIGNA, 131 S. Ct. at 1878.  The CIGNA Court clarified that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the *terms* of the plan for purposes of  § 502(a)(1)(B)." Id.  Hence, Clark's SPD claim against the Plan fails, because she can only bring that claim under 29 U.S.C. § 1132(a)(1)(B).

After CIGNA, Clark may still bring a claim for breach of fiduciary duty based on misinformation in the SPD. She states that she seeks compensatory damages under § 1132(a)(2) on behalf of the Plan, and individual equitable relief under § 1132(a)(3).  Pl.'s Statement at 21. For a claim under § 1132(a)(2), however, Clark must demonstrate that defendant's breach of ERISA's notice requirements caused a loss to the Plan or that a fiduciary received ill-gotten profits.  See 29 U.S.C. § 1109(a); see also Allison v. Bank One-Denver, 289 F.3d 1223, 1239

(10th Cir. 2002) (concluding that the "causal link" between a breach of duty and loss to the plan required by § 1109(a) was established by the fiduciary's failure to properly investigate its investments and inform the plan participants that it was discontinuing its monitoring of the investments); Hart v. Group Short Term Disability Plan for Emp. of Cap Gemini Ernst & Young, 338 F. Supp. 2d 1200, 1201 (D. Colo. 2004) ("[Plaintiff failed to allege[] harm to the Plan or ill-gotten profits to the fiduciary as a result of the fiduciary's alleged breach of its duties.").   Here, Clark alleges that the "loss" to the Plan was the value of the participants' accrued benefits consistent with the SPD and the gains to the defendants "were the ability to make preferential distributions from the Plan's assets" in their own interests.  Pl.'s Opp'n at 30.  But plaintiff's causal link is too attenuated -- the alleged lack of proper notice regarding PBGC insurance or potential loss of benefits did not cause the Plan to lose money nor permit the disputed distributions.  Hence, plaintiff may not proceed under § 1132(a)(2) on behalf of the Plan.

Clark's claim for breach of fiduciary duty under § 1132(a)(3), which provides for "other appropriate equitable relief," may fare better.  As explained above, the CIGNA Court explained that simply because a plaintiff is seeking monetary relief for a breach of fiduciary duty "does not remove it from the category of traditionally equitable relief."  CIGNA, 131 S. Ct. at 1880 ("Equity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment.").  The Court noted that "[t]he surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary."  Id.  Hence, surcharge may be an appropriate equitable remedy for Clark if she establishes a breach of fiduciary duty for failing to disclose in the SPD the lack of insurance and the potential loss of

benefits upon termination.

The Supreme Court pointed out that it is the plan administrator -- rather than the plan sponsor -- that "manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form." Id. at 1877.  Hence, Clark may only bring a claim for breach of fiduciary duty under § 1132(a)(3) based on misleading information in an SPD against the plan administrator.  The definition of an "administrator" is:  "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe."  29 U.S.C. § 1002(16)(A).  According to the Plan document, Feder Semo is listed as the Plan Administrator.  See Pl.'s Ex. 102 [Docket Entry 59-2] at 5, 7. Hence, plaintiff may only bring this claim against the firm Feder Semo.

Because Clark raises material issues of fact regarding whether the SPD language regarding Plan termination and the PBGC insurance is sufficiently clear as to whether the Plan is protected by the PBGC and how a participant's benefits can be reduced, see 29 C.F.R. §§ 2520.102-3(l) – (m), Clark states an ERISA violation by the plan administrator.  Clark may receive equitable relief in the form of surcharge against Feder Semo if she can demonstrates that the plan administrator's "violation [of ERISA] injured him or her."  See CIGNA, 131 S. Ct. at 1881.  "But to do so, he or she need only show harm and causation."  Id.  The Court clarified in CIGNA that "it is not always necessary to meet the more rigorous standard implicit in the words 'detrimental reliance'" -- instead, only "actual harm must be shown."  Id. ("Information-related

circumstances, violations, and injuries are potentially too various in nature to insist that harm must always meet that more vigorous 'detrimental harm' standard when equity imposed no such strict requirement.").  Defendants contend that plaintiff did not suffer "actual harm."  Clark counters that the misleading information caused her "and the other participants [to lose] the value of their accrued benefits consistent with the SPD and the leverage to better protect themselves with full disclosure."  Pl.'s Opp'n at 30.  Defendants have not demonstrated that Clark was provided information "clearly identifying circumstances which may result in . . . loss" of benefits, and she did not receive the complete value of her accrued benefit, so she is in the category of individuals who suffered "actual harm" and hence may proceed on her § 1132(a)(3) claim for breach of fiduciary duty based on the deficiencies in the SPD.

    IV.   <u>Actuarial and Interest Rate Assumptions</u>

Clark contends that Feder Semo and individual defendants Semo and Bard breached their fiduciary duty to "maintain the Plan on a sound actuarial basis" by failing to correct the underfunding of the Plan caused by an "unreasonable" 8% interest rate assumption.  Pl.'s Statement at 13.  Clark relies on 29 U.S.C. § 1083(h)(1)(A), which requires that "the determination of any present value or other computation under this section shall be made on the basis of actuarial assumptions and methods – [] each of which is reasonable (taking into account the experience of the plan and reasonable expectations)." § 1083(h)(1)(A).  She also maintains that the Plan's own funding policy requires that the Plan be maintained on a "sound actuarial basis." Pl.'s Statement at 13.  Defendants contend that plaintiff has not provided any support for her claim that the Plan's actuary, Mr. Reddington, failed to abide by the actuary standards of performance when setting the 8% interest rate or that such a rate was unreasonable.  Defs.' Reply

at 17.[3]

In its decision on reconsideration, the Court ruled that a genuine issue of material fact existed as to whether the fiduciaries used an improper interest rate assumption, or whether another fiduciary "acting in a like capacity and familiar with such matters" would have adopted the same approach. See Clark III, 736 F. Supp. 2d at 231-232 (citing Katsaros v. Cody, 744 F.2d 270, 280 (2d Cir. 1984)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (summary judgment appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]"). As the Court explained, the plan's fiduciaries "employed a projection about what the market interest rate would be," which "mattered because to the extent the market interest rate decreases relative to the Plan's projected interest rate, the present cash value of a beneficiary's annuity increases" and there is "a potential for the Plan to have unfunded liabilities." Clark III, 736 F. Supp. 2d at 232. Clark has presented evidence that the fiduciaries knew the plan was underfunded and that the Plan's fiduciaries used an interest rate assumption approximately 2.5% above the market rate. See id. Based on these facts, the Court ruled that there was a genuine issue of material fact as to whether a different fiduciary "acting in a like capacity and familiar with such matters," Katsaros, 744 F.2d at 280 (internal quotation

---

[3] Defendants' motion for summary judgment highlights that plaintiff's expert, Claude Poulin, "ha[d] not made a contrary assertion in this case" that the 8% rate was unreasonable. Defs.' Mot. at 29. In response, Clark attached a "Supplemental Expert Report" in her opposition to defendants' motion for summary judgment. Defendants move to strike the report as untimely and not in compliance with Fed. R. Evid. 702. Def's Mot. to Strike [Docket Entry #94]. At the June 30, 2011 motions hearing, plaintiff's counsel indicated that this report was not required for the resolution of plaintiff's claim regarding actuarial and interest rate assumptions, and the Court will not consider the expert report in its decision at this time.

marks omitted), would have adopted the same interest rate assumption in the years before the

Plan's termination.  These genuine disputed issues of material fact remain.

Defendants arguments to the contrary are not persuasive.  Defendants first contend that

selecting the interest rate is the role of the actuary, not the plan sponsor or other plan fiduciaries.

But plaintiff has presented evidence that defendants were at least involved in the rate selection

process, and even the Plan's outside counsel noted that he thought "the plan's sponsor [rather than

the actuary] has the final authority on . . . all assumptions." See Pl.'s Opp'n, Ex. 129 at 188.   And

the argument that ERISA does not require the Plan to be fully funded does not address the

possibility that the interest rate assumption was nonetheless "unreasonable" given the funding

circumstances of the Plan.  Hence, summary judgment for defendants on this claim must be

denied, and the Court will permit Clark to go forward on her interest rate assumption theory.

V.     Distributions to the Feders

Plaintiff brings a claim against defendants Semo and Bard for breach of fiduciary duty for

permitting distributions to the Feders in 2002 and 2005 that Clark alleges were not restricted in

accordance with Treasury Regulation 1.401(a)(4)-5(b), and therefore violated 29 U.S.C. §

1103(d)(1).  Pl.'s Statement at 15-16; Pl.'s Opp'n at 41.  Plaintiff's statutory basis for this claim,

which has evolved throughout this case, is now as follows. ERISA provision 29 U.S.C. §

1103(d)(1) provides that "the assets of the plan shall be allocated in accordance with the

provisions of § 1344."  Section 1344(5), in turn, provides that "[i]f the Secretary of the Treasury

determines that the allocation made pursuant to this section . . . results in discrimination

prohibited by [26 U.S.C. § 401(a)(4)] then, if required to prevent the disqualification of the plan .

. .  the assets allocated [under the provisions of § 1344] shall be reallocated to the extent

necessary to avoid such discrimination."[4]  Section 401(a)(4) is a provision of the tax code that

requires that pension plan "contributions or benefits . . . do not discriminate in favor of highly

compensated employees" for such a plan to remain a "qualified trust" (i.e., a plan that has tax-

exempt status).  Under 26 C.F.R. § 1.401(a)(4)-5(b)(3)(iv), distributions to highly compensated

employees need not be restricted if the value of plan assets "equal or exceed 110% of the value of

the current liabilities."  Here, for example, the distributions to Loretta and Gerald Feder (both

highly compensated employees) would not need to be restricted -- to maintain compliance with

the Internal Revenue Code ("I.R.C.") -- if the value of the Plan assets would not be reduced

below 110 percent.[5]  Hence, plaintiff's claim is that the Plan was not funded at 110% after the

distribution to Loretta Feder in 2002 or Gerald Feder in 2005, which was a violation of ERISA

and a breach of fiduciary duty by Semo and Bard.

 As to Mr. Feder's claim, plaintiffs allege that his distribution in 2005 violated 26 C.F.R. §

1.401(a)(4)-5(b)(2), which provides that "a plan must provide that, in the event of plan

termination, the benefit of any [current or former highly compensated employee] is limited to a

---

 [4]Indeed, 29 U.S.C. § 1344(5), rather than providing the basis for the claim that plaintiff
seeks against Semo and Bard, actually provides protection for pension plans (that do not want to
lose tax-exempt status) against anti-cutback claims by highly compensated employees.  See, e.g.,
Hixson v. Liberty Corp. 964 F. Supp. 218, 225 (W.D. La. 1997) (ruling that an optional form of
benefit may be reduced or eliminated if necessary to comply with 26 U.S.C. § 401(a)(4) and Rev.
Rul. 92-76);  Sikorski v. Sikorski, 930 F. Supp. 804, 810 (E.D.N.Y.  1996) (explaining that a
plan's refusal to make a lump sum distribution was justified to comply with the I.R.C. and Rev.
Rul. 92-76 prohibition against discrimination in favor of highly compensated employees).

 [5]In the Court's reconsideration decision, it explained that "the conflict between the
actuary's calculations and the Form 5500s [that showed less than 110% funding] creates a
genuine issue of material fact as to whether the Retirement Plan had sufficient assets to permit
the December 2002 distribution to Loretta Feder."  Clark III, 736 F. Supp. 2d at 230.  Because
plaintiff has clarified the basis of her claim -- violation of 26 C.F.R. § 1.401(a)(4)-5(b) -- the
Court now rules plaintiff may not bring such a claim.

benefit that is nondiscriminatory under section 401(a)(4)." To demonstrate that the 2005

distribution to Mr. Feder violated 26 C.F.R. § 1.401(a)(4)-5(b), Clark cites to Revenue Ruling

92-76, claiming it requires that a plan compare the "accumulated amount of distributions" to the

Feders to the distributions made to other participants upon termination.[6]   On reconsideration, the

Court noted "[i]t now appears that Clark cited Revenue Ruling 92-76 not to allege a violation of

the ruling itself, but rather to demonstrate that the November 2005 distribution violated 26

C.F.R. § 1.401(a)(4)-5(b)," and that "the Court did not previously consider this issue." Clark III,

736 F. Supp. 2d at 233-34.  The Court has now considered fully plaintiff's claims regarding the

2002 distribution to Mrs. Feder and 2005 distribution to Mr. Feder, and neither may proceed for

the following reasons.

"Violations of I.R.C. sections do not, standing alone, create substantive statutory rights

[under ERISA]." Hollowell,  711 F. Supp. 2d at 770-71; Reklau v. Merchants Nat'l Corp., 808

F.2d 628, 631 (7th Cir. 1986). "There is no basis, under . . . ERISA, to find that the provisions of

[26 U.S.C.] § 401-- which relate solely to the criteria for tax qualification under the Internal

Revenue Code -- are imposed on pension plans by the substantive terms of ERISA." Reklau, 808

F.2d at 631.  In Reklau, the Seventh Circuit explained that if "Congress intended that § 401 of the

I.R.C. be applicable to ERISA, it would have so stated in clear and unambiguous language as it

did in 29 U.S.C. § 1202(c) with §§ 410(a), 411 and 412 of the I.R.C.," which expressly apply the

I.R.C.'s "minimum participation, vesting and funding standards" to ERISA.  Id.; accord Stamper

_____

[6]As the Court noted previously, plaintiff overstates the contents of Revenue Ruling 92-76.
This ruling considered whether a retirement plan that permitted distributions that nominally
violated 26 C.F.R. § 1.401(a)(4)-5(b) were nevertheless permissible because the plan included
"adequate provisions to secure any necessary repayment in the event of a plan termination."  Rev.
Rul. 92-76.  Here, the Plan contains no such provisions.

v. Total Petroleum, Inc., 188 F.3d 1233, 1238-39 (10th Cir. 1999); West v. Clarke Murphy Jr.

Self Employed Pension Plan, 99 F.3d 166, 169 (4th Cir. 1996).   To the contrary, "26 U.S.C. 401

'does not create any substantive rights that an individual can enforce as a participant or

beneficiary under a tax qualified plan.'" Eaton v. Onan Corp., 117 F. Supp. 2d 812, 848 (S.D. Ind.

2000) (citations omitted).

   "Whether an ERISA plan discriminates in favor of highly compensated employees is only

important for tax purposes.  Such tax concerns are matters between the employer and the Internal

Revenue Service."  Furnari v. Dornan, 12 F.3d 1106 (table), 1993 WL 501517, at *2 (9th Cir.

Dec. 6, 1993).  "A violation of the Internal Revenue Code does not effectively amount to a

breach of fiduciary duty under ERISA, or a separate private right of action under ERISA."

Hollowell, 711 F. Supp. 2d at 770-71.  Indeed, "it would be improper to read into ERISA a

requirement Congress elected to apply only to the Tax Code.  Accordingly, section 401[] cannot

provide [plaintiff] with [her] requested ERISA relief." Stamper, 188 F.3d at 1239.   Here, even if

the distributions to Gerald and Loretta Feder violated 26 C.F.R. § 1.401(a)(4)-5(b), the

consequence would be for the Plan to lose its favorable tax status.  This is not a violation of

ERISA permitting Clark to bring a breach of fiduciary duty claim under ERISA.  Plaintiff cites

no cases to the contrary. Hence, defendants' motion for summary judgment is granted as to this

claim.

## CONCLUSION

   For the foregoing reasons, the Court will grant in part and deny in part defendants' motion

for summary judgment.  Summary judgment for defendants on the improper grouping claim is

denied.  However, as explained above, Clark may proceed only under § 1132(a)(1)(B) or §

1132(a)(3).  Clark may also proceed on her § 1132(a)(3) claim for breach of fiduciary duty based

on the deficiencies in the SPD and her actuarial and interest rate assumption theory.  Summary

judgment for defendants is granted as to Clark's anti-cutback claim and her claim that the

distributions to the Feders violated 29 U.S.C. § 1103(d)(1).  A separate order accompanies this

Memorandum Opinion.


_____
/s/
John D. Bates
United States District Judge

Dated: September 7, 2011